IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

CHUE CHA,

                    Plaintiff,                                    OPINION AND ORDER

          v.
                                                                 11-cv-339-wmc
MICHAEL J. ASTRUE,
Commissioner Social Security Administration,

                    Defendant.

Pursuant to 42 U.S.C. § 405(g), plaintiff Chue Cha seeks reversal of an adverse decision of the Commissioner of Social Security, finding her ineligible for Supplemental Security Income.  Cha contends that the administrative law judge ("ALJ") erred in (1) determining that her mental impairments did not meet a listed impairment; (2) discounting the opinion of her treating physician, Dr. Zurob; (3) disregarding the opinion of Cha's treating counselor Kristie Bugs; and (4) assessing Cha's credibility.  For the reasons set forth below, the court agrees that the ALJ erred in failing to give sufficient weight to the opinion of treating sources and will remand the case for re-consideration of those opinions.

FACTS[1]

A. Background

Chue Cha was born on January 1, 1973 in Laos, and lived in a Hmong refugee camp in Thailand for 20 years, before eventually being repatriated to the United States. (AR 180.) She is not able to communicate in English and has no past relevant work.   (AR 28.)

---

[1] The following facts are drawn from the administrative record (AR).

On August 24, 2007, Cha filed an application for supplemental security income, alleging disability as of January 1, 1973, because of lung disease, depression and post-traumatic stress disorder.  (AR 19.)  After the local disability agency denied Cha's application, both initially and upon reconsideration, she requested a hearing, which was held before Administrative Law Judge Elizabeth Lishner on March 22, 2010.  (AR 34-55.)  On April 8, 2010, the ALJ issued her decision, finding Cha not disabled.  (AR 17-29.)  This decision became the final decision of the Commissioner on March 30, 2011, when the Appeals Council affirmed the decision of the ALJ.  (AR 1-5.)

## B. Medical Evidence

### 1. Physical Impairment

In 2006 and 2007, Cha's primary physician was Dr. Jaqueline D'Souza.  (AR 208, 222, 224.)  She diagnosed Cha with chronic granulomatous lung disease with bronchiectasis.[2]  D'Souza also noted Cha reported being depressed and looked despondent. (AR 208, 224.)  Cha first saw pulmonologist Adel Zurob on January 19, 2007.  At that time, Cha had been in the United States for over a year.  A chest x-ray and computer resonance imaging scan showed bilateral cylindrical bronchiectasis in a peripheral distribution in the

---

[2] Chronic granulomatuous disease is a genetic disorder in which certain immune system cells are unable to kill some types of bacteria and fungi.  Bronchiectasis is a condition in which damage to the large airways that carry air in and out of the lungs causes them to widen and become flabby and scarred, increasing susceptibility to lung infections and complications.

lower lobes mainly. (AR 201.) Her pulse oximetry was 96 per cent at rest. Zurob ordered tests and adjusted her medications. (AR 202-203.)

Cha returned to see Dr. Zurob on March 5, 2007, reporting that she had shortness of breath and wheezing on exertion. Zurob prescribed two new medications for her, Duo Neb and Theo-Dur. (AR 199.) When Cha returned to see Dr. Zurob in June 2007, she reported improvements in shortness of breath and coughing on the DuoNeb, but continued to complain of shortness of breath if she pushes herself. (AR 195.) On July 30, 2007, Cha saw Zurob again, but failed to bring her medications as requested. While her pulse oximetry was 99 per cent at rest, Dr. Zurob noted that "She is unable to do any physical work because of her lungs, which I agree with." (AR 192.)

On August 13, 2007, Cha saw Dr. Zurob again and brought in her medications. Zurob concluded that Cha was on a good regimen of medications and that her condition had improved, but also noted that Cha was unlikely to find work because of her symptoms. (AR 190.) During a follow up visit on October 22, 2007, Cha told Zurob that she believed there is a cure but that he is holding back. Nevertheless, she declined a referral for a second opinion. (AR 374.) Cha continued to see Dr. Zurob through 2008. (AR 367-71.)

Cha ultimately did ask for a referral for a second opinion on January 12, 2009. (AR 367.) Cha was then referred to Dr. Dany S. Abou Abdallah, also a pulmonologist. Cha reported persistent cough, shortness of breath with even minimal activity, regular wheezing and significant sputum production. (AR 364.) On examination, Abdallah heard bilateral coarse crackles up to the midlungs an a few end expiratory wheezes, although her resting

3

pulse oximetry reading was still 98 per cent.  Dr. Abdallah diagnosed Cha with bibasilar cylindrical bronchiectasis with recurrent exacerbations.  (AR 365.)

Cha returned to see Dr. Abdallah on February 6, 2009 and reported sleeping better with less cough.  Cha's pulse oximetry at rest was 97 percent and 92 percent after exertion.  (AR 362.)  Abdallah encouraged Cha to engage in regular physical activity, but she declined a referral for pulmonary rehabilitation for transportation reasons.  (AR 363.)

On March 20, 2009, Cha reported to Dr. Abdallah that she was feeling worse.  He prescribed antibiotics and prednisone therapy.  (AR 360.)  When Cha returned to see Abdallah in April she was feeling better.  (AR 357.)

On November 24, 2009, Dr. Zurob completed a Pulmonary Residual Functional Capacity Questionnaire for Cha listing her diagnoses as bronchiectasis and chronic obstructive pulmonary disease.  (AR 401.)  Dr. Zurob concluded that Cha:  could sit about four hours in an eight-hour work day and stand or walk less than two hours; would have to take two unscheduled breaks of 20-30 minutes in an eight-hour day; was incapable of performing "low-stress" jobs; and had symptoms that would interfere with her ability to perform even simple work tasks up to one-third of the workday.  (AR 402-403.)  Zurob also found that Cha would have to avoid all exposure to extreme cold and hear, high humidity, fumes, odors, gases and chemicals.  (*Id.*)  Finally, he concluded that she would have to miss more than four days of work a month.  (AR 404.)

2. <u>Mental Impairment</u>

On February 15, 2007, around the same time Cha began seeing Dr. Zarob for her lung issues, she also began seeing Dr. J. Scott Persing, a psychiatrist at Dunn County Human Services, for depression and anxiety.  Dr. Persing observed that Cha had impaired insight and judgment, mildly decrease psychomotor activity, depressed mood, anxious affect, fair eye contact, appropriate grooming and hygiene and logical thought process with no delusions or hallucinations.  He also found her alert and oriented.  Persing diagnosed Cha with an anxiety disorder, likely post-traumatic stress disorder and assessed her Global Assessment of Functioning Score at 45.[3]  He prescribed Remeron for Cha's depression, anxiety and insomnia.  (AR 188-89.)

On May 14, 2007, Cha returned to see Dr. Persing, who noted that she had not re-filled her prescription for Remeron since February.  He also noted that she does not know how to read.  Persing indicated he would attempt to have the pharmacy set up pill boxes for her. (AR 186.)  In July 2007, Dr. Persing saw Cha and noted she had been taking Remeron, but that it was making her groggy, causing him to reduce the dosage.  (AR  185.)  In September 2007, Persing indicated Cha was not taking her medication again.  (AR 182.)

---

[3]The Global Assessment Functioning scale reports a clinician's assessment of the individual's overall level of functioning.  *Sims v. Barnhart*, 309 F.3d 424, 427 n. 5 (7th Cir. 2002).  A GAF of 21-30 indicates inability to function in almost all areas; 31-40 indicates major impairment in several areas; 41-50 indicates serious symptoms; 51-60 indicates moderate symptoms; and 61-70 indicates mild symptoms. American Psychiatric Association, <u>Diagnostic and Statistical Manual of Mental Disorders</u> 34 (4th ed. 2000) (Text Revision).

On March 15, 2008, Dr. Persing saw Cha and noted she had been doing well psychiatrically. Her mental status exam was normal except for restricted affect. (AR 315.) On October 13, 2008, Persing increased Cha's Remeron dosage. (AR 310.) On December 8, 2008, Persing reported Cha was less depressed, but having more stress because of medical issues. (AR 386.)

On March 9, 2009, Cha saw Dr. Persing, who noted that she was doing a bit better. She continued to feel a bit stressed and occasionally depressed during the day. (AR 382.) In October 2009, Persing again increased Cha's dosage of Remeron. (AR 408.)

On December 29, 2006, Cha began counseling for depression and post-traumatic stress syndrome with Kristie Bugs, MS/LCSW. Bugs also assessed Cha with a Global Assessment of Functioning score of 45. (AR 180-81.) Throughout the 2007 counseling sessions with Cha, she observed that she was tearful and depressed. (AR 177-78, 183-84, 319, 321-22.) In 2008, Bugs noted that Cha continued to be depressed. (AR 309-311, 318-19.)

On January 16, 2009, Bugs observed that Cha appeared to be defeated, depressed, frustrated with her life and very stressed. (AR 384.) In 2009, Bugs continued to observe that Cha was depressed. (AR 379, 406.)

On July 27, 2009, Bugs completed a mental residual functional capacity questionnaire for Cha, noting that she had seen her twice a month since August 2007. (AR 389.) She indicated that Cha was chronically depressed and anxious and that her memory and concentration are impaired. (AR 391.) Bugs again assessed Cha's then current Global

Assessment of Functioning Score at 45, indicating that was the highest score of the past year. (AR 389.)  Given her mental health history, Bugs concluded that Cha would not be able to sustain the mental demands of unskilled work.  (AR 394-97.)

## C.  Consulting Physicians

On December 12, 2007, Mark Schmidt, a state agency respiratory therapist, attempted to perform a pulmonary function test on Cha, but could not because of her general weakness.  (AR 110.)  On December 18, 2007, Dr. Steven Brown, an internist, examined Cha at the request of the state disability agency.  (AR 268.)  On examination, Cha's oxygen saturation was 99 per cent at rest and after exertion.  He diagnosed her with bronchiectasis and chronic granulomatous lung disease.  Brown noted that she had depression and anxiety and could not see real well.  He nevertheless concluded that she could perform very sedentary work using her hands.  (AR 269.)

On January 7, 2008, state agency physician Pat Chan also completed a physical residual functional capacity assessment for Cha, listing a diagnoses of bronchiectasis, status post pulmonary tuberculosis and fatigue.  (AR 270.)  Chan found that Cha could lift 10 pounds occasionally and less than 10 pounds frequently, stand or walk two hours in an eight-hour workday and sit six hours in an eight-hour workday.  (AR 271.)

On January 8, 2008, state agency psychologist Roger Rattan also completed a psychiatric review technique form for Cha, finding that she had an affective disorder.  (AR 278.)  More specifically, Rattan found that Cha had (1) mild restrictions of activities of daily

living; (2) moderate difficulties in maintaining social functioning (3) mild difficulties in maintaining concentration, persistence or pace; and (4) no episodes of decompensation. He also noted that there was no evidence of the "C" criteria. (AR 288-89.)

Rattan also completed a mental residual functional capacity assessment for Cha, finding her moderately limited in (1) her ability to understand, remember and carry out detailed instructions; (2) her ability to complete a normal work day and work week without interruptions from psychologically based symptoms; (3) her ability to perform at a consistent pace without an unreasonable number and length of rest periods; (4) her ability to interact appropriately with the general public; (5) her ability to ask simple questions or request assistance; (6) her ability to respond appropriately to changes in the work setting; and (7) her ability to set realistic goals or make plans independently of others. (AR 292-93.)

On November 27, 2008, state agency respiratory therapist Mark Schmidt also attempted to perform pulmonary testing on Cha. Schmidt noted that she was weak and had difficulty following instructions. (AR 326.)

On December 22, 2008, state agency psychologist Eric Edelman completed a psychiatric review technique form for Cha, finding that she had an anxiety-related disorder. (AR 338.) Edelman found that she had moderate restrictions of activities of daily living, mild difficulties in maintaining social functioning, moderate difficulties in maintaining concentration, persistence or pace and no episodes of decompensation. He also noted that there was no evidence of the "C" criteria. (AR 348-49.)

Edelman also completed a mental residual functional capacity assessment for Cha. He found she was moderately limited in (1) her ability to understand, remember and carry out detailed instructions; (2) her ability to maintain attention and concentration for extended periods; (3) her ability to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; (4) her ability to complete a normal work day and work week without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; (5) her ability to accept instructions and respond appropriately to criticism from supervisors; (6) her ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; (7) her ability to respond appropriately to changes in the work setting; and (8) her ability to set realistic goals or make plans independently of others. (AR 352-53.)  Edelman concluded that although Cha had moderate limitations in all areas of functioning she retained the ability to perform unskilled work.  (AR 354.)

## D.  Hearing Testimony

At the hearing, Cha testified through an interpreter that she did not know her date of birth or where she was born.  (AR 40.)  While aware that she was married, she also testified to not knowing what city she was living in.  (AR 41.)

Cha testified to having trouble with breathing and shortness of breath. (AR 41.) Cha also testified that she could climb two stairs, walk two blocks and stand for one to two

minutes. (AR 42.) She takes four medications for her breathing problems. Sometimes she gets confused about her medications, but her husband helps her with them. (AR 43.)

Cha also testified that during the days her children are in school, her husband does all the household chores and helps her to bathe. (AR 47.) She testified that he is depressed and anxious. (AR 47-48.) Doctors have told her to walk for exercise. (AR 49.)

Next, the ALJ called Ron Natachyama to testify as a neutral vocational expert. Natachyama noted that Cha had never worked, had no education and could not read Hmong. (AR 50.) The ALJ asked the expert to assume that such an individual who could lift and carry 10 pounds occasionally and frequently; sit for eight hours in an eight-hour work day; walk less than two hours in an eight-hour work day with no more than five minutes at a time; stand for two hours in an eight-hour workday; cannot climb ladders, ropes or scaffolds; and must avoid concentrated exposure to perfumes and solvents, moderate exposure to wetness and dust and all exposure to gases, fumes, extreme temperatures and chemicals. (AR 50-51.) The expert responded that the individual could perform the sedentary, unskilled job of bench assembler, DOT # 739.687-182 (600-700 jobs nationally) and the sedentary, unskilled job of lens inserter, DOT #713.687-025 (375,000 jobs nationally). (AR 50.) In the second hypothetical question, the ALJ added that the same individual would be limited to simple repetitive tasks, but could perform both the identified jobs. (AR 51.)

On cross-examination by Cha's attorney, the expert testfied that if the individual could stand less than two hours a day, she could perform the identified jobs. (AR 52.)

However, the expert testified that if the individual had to take unscheduled breaks, could sit four hours in an eight-hour work day or would be absent from work four or more days a month, then the individual could not perform the identified jobs.  (AR 52-53.)[4]

## E.  ALJ's Decision

In reaching her conclusion that Cha was not disabled, the ALJ performed the required five-step sequential analysis.  *See* 20 C.F.R. §§ 404.1520, 416.920.[5]  At step one, the ALJ found that Cha had not engaged in substantial gainful activity since August 24, 2007, the application date.  At step two, she found that Cha had severe impairments of chronic granulomatous lung disease with bronchiectasis, depression and post-traumatic stress disorder.  (AR 19.)  At step three, the ALJ found that Cha did not have an impairment or combination of impairments that met or medically equaled any impairment listed in 20 C.F.R. 404, Subpart P, Appendix 1.  Specifically, she found that Cha's chronic obstructive pulmonary disease did not meet or equal the requirements of Listing 3.02(A), (B) or (C),

---

[4] The expert testified that his testimony was consistent with the information in *The Dictionary of Occupational Titles*.  (AR 51.)

[5] Under this test, the ALJ sequentially considers (1) whether the claimant is currently employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed in 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant can perform her past work; and (5) whether the claimant is capable of performing work in the national economy.  *Knight v. Chater*, 55 F.3d 309, 313 (7th Cir. 1995).  If a claimant satisfies steps one through three, she is automatically found to be disabled.  If the claimant meets steps one and two, but not three, then she must satisfy step four.  *Id*.  The claimant bears the burden of proof in steps one through four.  If the claimant satisfies step four, the burden shifts to the Commissioner to prove that the claimant is capable of performing work in the national economy.  *Id.*

that her bronchiectasis did not satisfy listing 3.07 (A) or (B) and that her lung disease did

not satisfy Listing 3.08.  (AR 19-20.)

The ALJ also found that Cha's mental impairment did not meet listings 12.04 or

12.06.  She found that Cha had only mild difficulties with activities of daily living and social

functioning, moderate difficulties of maintaining concentration, persistence or pace, and no

episodes of decompensation or evidence of the "C" criteria.  (AR 20.)  She further found that

Cha retained the residual functional capacity to perform work requiring lifting and carrying

10 pounds, occasionally and frequently; sitting for eight hours in an eight-hour work day;

walking less than two hours in an eight-hour work day with no more than five minutes at a

time; standing for two hours in an eight-hour workday; and occasional crouching.  Still, she

cannot climb ladders, ropes or scaffolds; and must avoid concentrated exposure to perfumes

and solvents, moderate exposure to wetness and dust and all exposure to gases, fumes,

extreme temperatures and chemicals.  Finally, the ALJ limited Cha to work activity requiring

only simple 1 to 3 step tasks.  (AR 21.)

In determining Cha's residual functional capacity, the ALJ assessed her credibility

according to the requirements of 20 C.F.R. 404.1529 and 416.929 and Social Security

Rulings 96-4p and 96-7p.  The ALJ considered Cha's testimony that she could not work

because of difficulty breathing, fatigue, depression and worrying.  After considering the

medical evidence, the ALJ concluded that with respect to her physical problems, her

testimony that she was not able to work was less than fully credible.  (AR 21-22. )  Next the

ALJ reviewed the medical records concerning Cha's mental impairment, concluding that this

evidence did not support Cha's allegations that her mental impairment prevented her from working.  (AR 24.)  The ALJ also considered Cha's course of treatment in determining her credibility, noting that Cha failed to follow recommendations made by her treating physicians, including taking her medications.  The ALJ nevertheless found that her extensive treatment had been successful in controlling her symptoms.  (AR 25.)  Also, she concluded that Cha's credibility was adversely affected because she had provided inconsistent information.

In addition to assessing Cha's credibility, the ALJ considered the statements and assessments of Cha's treating physician Dr. Zurob.  She discounted Zurob's conclusory statements that she was unable to do physical work, but for the most part accepted his residual functional capacity assessment.  The major differences were that Zurob found that Cha could only sit four hours in an eight-hour work day and would miss more than four days of work a month, while the ALJ discounted these statements, finding that they were not supported by the medical evidence and that Cha herself had not testified she had any difficulty sitting.  (AR 27.)

The ALJ also considered the state agency physicians' opinions that Cha could perform a full range of sedentary work using her hands.[6]  (AR 27.)  While noting that Cha's treating psychiatrist, Dr. Persing, had not provided any restrictions on her mental ability to work, the ALJ discounted Persing's Global Assessment of Functioning Score of 45 because it was three years old and provided no longitudinal evidence of Cha's mental functioning.  Also,

---

[6] While the ALJ attributed the opinion with respect to Cha's use of her hands to Dr. D'Souza, the record indicates that it was that of the consulting physician Dr. Brown.

she discounted the Mental Residual Functional Capacity Assessment of Bugs because she was not an acceptable medical source and her reports were based on Cha's subjective complaints. In contrast, the ALJ gave greater weight to the opinion of state agency psychologists Rattan and Edelman that Cha retained the ability to perform unskilled work. (AR 28.)

At step five, the ALJ found that Cha could perform the occupations of bench assembler and lens inserter based on the testimony of the vocational expert. Noting that this testimony was consistent with the information contained in the *Dictionary of Occupational Titles*, the ALJ concluded that Cha was not disabled. (AR 28-29.)

OPINION

The standard by which a federal court reviews a final decision by the commissioner is well settled:  the commissioner's findings of fact are "conclusive" so long as they are supported by "substantial evidence." 42 U.S.C. § 405(g). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). When reviewing the commissioner's findings under § 405(g), the court cannot reconsider facts, re-weigh the evidence, decide questions of credibility or otherwise substitute its own judgment for that of the ALJ. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). Thus, where conflicting evidence allows reasonable minds to reach different conclusions about a claimant's disability, the responsibility for the decision falls on the commissioner. *Edwards v. Sullivan*, 985 F.2d 334, 336 (7th Cir. 1993).

Nevertheless, the court must conduct a "critical review of the evidence" before affirming the commissioner's decision, *id.*, and the decision cannot stand if it lacks evidentiary support or "is so poorly articulated as to prevent meaningful review." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).  When the administrative law judge denies benefits, he must build a logical and accurate bridge from the evidence to his conclusion. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001).  The failure of the ALJ to meet this requirement with respect to her reasons for discounting the opinions of treating medical sources dooms this case to remand.

I.      Dr. Zurob's Opinion

Cha claims that the ALJ erred by rejecting several portions of her treating physician's opinion without adequate explanation.  Generally, opinions from sources who have treated the plaintiff are entitled to more weight than non-treating sources, and opinions from sources who have examined the plaintiff are entitled to more weight than opinions from non-examining sources.  20 C.F.R. §§ 404.1527(d)(1) and (2), 416.927(d)(1) and (2).  Other factors the ALJ should consider are the source's medical specialty and expertise, supporting evidence in the record, consistency with the record as a whole and other explanations regarding the opinion. *Haynes v. Barnhart*, 416 F.3d 621, 630 (7th Cir. 2005); 20 C.F.R. §§ 404.1527(d)(3)-(6), 416.927(d)(3)-(6).

In addition, the administrative law judge "must explain in the decision" the weight given to these various medical opinions.  20 C.F.R. §§ 404.1527(f)(2)(ii); 416.927(f)(2)(ii).

"[T]he weight properly to be given to testimony or other evidence of a treating physician depends on circumstances." *Hofslien v. Barnhart*, 439 F.3d 375, 377 (7th Cir. 2006). When a treating physician's opinion is well supported and no evidence exists to contradict it, the ALJ has no basis on which to refuse to accept the opinion. *Id.*; 20 C.F.R. § 404.1527(d)(2). When, however, the record contains well supported contradictory evidence, the treating physician's opinion "is just one more piece of evidence for the ALJ to weigh," taking into consideration the various factors listed in the regulation. *Id*. These factors include the number of times the treating physician has examined the claimant, whether the physician is a specialist in the allegedly disabling condition, how consistent the physician's opinion is with the evidence as a whole and other factors. 20 C.F.R. § 404.1527(d)(2); *Scott v. Astrue*, 647 F.3d. 734, 740 (7th Cir. 2011).

Here, the most troubling aspect of the ALJ's analysis is her failure to address Dr. Zurob's opinion as a treating physician that Cha needed to take two unscheduled breaks of 20-30 minutes in an eight-hour day, was incapable of performing "low-stress" jobs and had symptoms that would interfere with her ability to perform even simple work tasks up to one-third of the work day. The Commissioner responds unpersuasively that the ALJ need not address every piece of evidence. While obviously true in the abstract, the ALJ cannot simply ignore portions of Dr. Zurob's opinion that would be favorable to a finding of disability, after purporting to rely heavily on his opinion to formulate the RFC (AR 26). *White*, 167 F. 3d. 375 (an ALJ erred in failing to give good reasons for rejecting portions of treating expert's opinion). Specifically, Cha's treating pulmonologist identified symptoms of wheezing and

shortness of breath with exertion. (AR. 373-74).  He also noted that she was chronically

producing large amounts of sputum, occasionally off-white, with her diagnosis of

bronchieictasis. *Id.*

The fact that the ALJ ignored these aspects of the opinion of Dr. Zurob requires

remand for re-consideration.  *See Campbell v. Astrue*, 627 F3d 299, 306 (7th Cir. 2010)(an

ALJ must not selectively discuss portions of a physician's report that support a finding of non-

disability while ignoring other portions that suggest a disability).


II.      Social Worker Kristie Bugs

Cha claims that the ALJ also erred in discounting the opinion of Kristie Bugs that Cha

would not be able to sustain the mental demands of unskilled work. Evidence from "other

sources," such as licensed clinical social workers, can establish the severity of the impairment

and how it affects the claimant's ability to function.  20 C.F.R. § 404.1513(d).  As explained

in Social Security Ruling, 06-03p, :

> With the growth of managed health care in recent years and the emphasis on
> containing medical costs, medical sources who are not "acceptable medical
> sources," such as nurse practitioners, physician assistants, and licensed **clinical
> social workers**, have increasingly assumed a greater percentage of the
> treatment and evaluation functions previously handled primarily by physicians
> and psychologists. Opinions from these medical sources, who are not
> technically deemed "acceptable medical sources" under our rules, are important
> and should be evaluated on key issues such as impairment severity and
> functional effects, along with the other relevant evidence in the file.

http://www.ssa.gov/OP_Home/rulings/di/01/SSR2006-03-di-01.html (emphasis added). This

ruling goes on to explain that adjudicators should consider the same factors in weighing

opinions from "other" medical sources that they use in weighing "acceptable" medical sources, including the length and frequency of the treatment relationship, the consistency of the opinion with other evidence, the source's specialty and the degree to which the source presents relevant evidence to support the opinion. *Id.*

In contrast, the ALJ rejected Bugs's opinion because she was not an acceptable medical source and her reports were based on Cha's subjective complaints. Other than this conclusory statement, there is little (if any) meaningful analysis by the ALJ of the relevant factors used to weigh the opinion of Ms. Bugs as Cha's treating social worker. To the extent the ALJ can be read to have rejected Ms. Bugs's opinion based on subjective complaints and not on "objective observations" (AR 27), this is in not consistent with her treatment notes over a three year period, which included her observations of Cha's mental state, *as well as* her recitation of Cha's subjective complaints. Indeed, Bugs observed that Cha was tearful and depressed; she also observed that Cha appeared to be defeated, depressed, frustrated with her life and very stressed. Moreover, these observations were *confirmed* by the contemporaneous observations and diagnosis of Cha's treating psychiatrist, Dr. Persing. Given that the relevant factors in SSR 06-03p have not been properly addressed with respect to Bugs' opinion -- and that what limited analysis there is in the ALJ decision is inconsistent with Bugs' treatment notes -- the court has little choice but to conclude that ALJ failed to justify discounting the opinion of Bugs.

Furthermore, Bugs's finding that Cha had a Global Assessment of Functioning Score of 45 in 2009 contradicts the ALJ's conclusion that Dr. Persing's 2007 Global Assessment of

Functioning Score of 45 should be discounted because it was three years old.  Accordingly, on remand, the ALJ should properly consider Bugs' opinion that Cha's mental impairments made her unable to work, as well as the impact of her conclusion that Cha's Global Assessment of Functioning Score continued to be 45 in 2009.  She should also consider the opinion of Bugs in conjunction with the limitations imposed by the state agency psychologists.[7]

## ORDER

IT IS ORDERED that the decision of defendant Michael J. Astrue, Commissioner of Social Security, denying plaintiff Chue Cha's application for disability insurance  benefits is REVERSED AND REMANDED pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.  The clerk of court is directed to enter judgment for plaintiff and close this case.

Entered this 24th day of June, 2014.

BY THE COURT:

/s/

_____
WILLIAM M. CONLEY
District Judge

---

[7] Given the ALJ's failure to adequately weigh the medical evidence, the court need not address Cha's arguments concerning the ALJ's findings at step three and credibility determinations.  Indeed, it would seem premature to do so since these findings may be different after the ALJ re-weighs the opinions of Dr. Zurob and Kristie Bugs.  In addition to whether the ALJ properly assessed Cha's credibility and whether Cha's mental impairments met a listed impairment.  Cha asserts a  broader challenge to the ALJ's RFC finding -- that the ALJ violated SSR 96-8p by failing to explain material inconsistencies or ambiguities in the case record.  Upon remand, the ALJ should take care to address any remaining inconsistencies in the RFC.